390 F.2d 836
 Vincent DEMARCO, Belle Pomerantz and Mary Roth, on behalf of
themselves and all others similarly situated,
Plaintiffs-Appellants,
v.
Robert B. EDENS, Martin Lasher, Precision Metal Products,
Inc., Philip Tashman, Harry Schwartz, John Doe and Richard
Roe, the names John Doe and Richard Roe being fictitious,
the true names of said defendants being unknown to
plaintiffs, the parties intended being more fully described
in the complaint, Defendants-Appellees.
Anthony GRANDINETTI, AI Langer, Angela Bennetti, celia
Israel, Stanley F. Harrison, Jr., Harold K.
Stearns, and Helen Stearns, Plaintiffs-Appellants,
v.
Robert B. EDENS, Martin Lasher, Precision Metal Products,
Inc., Philip Tashman, Harry Schwartz, John Doe and Richard
Roe, the names John Doe and Richard Roe being fictitious,
the true names of said defendants being unknown to
plaintiffs, the parties intended being more fully described
in the complaint, Defendants-Appellees.
 Nos. 21, 22, Dockets 31067, 31068.
 United States Court of Appeals Second Circuit.
 Argued Sept. 19, 1967.
Decided March 7, 1968.
 
 Irving Malchman, Jerome J. Klied, Malchman & Klied, New York City, for plaintiffs-appellants.
 Peter P. Smith, III, Francis J. Purcell, Shea, Gallop, Climenko & Gould, New York City, for defendants-appellees Precision Metal Products, Inc., Philip Tashman and Harry Schwartz.
 Before LUMBARD, Chief Judge, and WATERMAN and FEINBERG, Circuit judges.
 WATERMAN, Circuit Judge:
 
 
 1
 In two actions, allegedly maintainable as class actions, brought by different sets of plaintiffs but later consolidated for trial, each petitioner sought to recover the purchase price of $3.00 a share paid by petitioners for blocks of Precision Metal Products, Inc. common stock which had been purchased in November and December 1961. A New York underwriter, Armstrong & Co., Inc. (Armstrong) had agreed to market the stock of Precision Metal Products, Inc. on a 'best efforts' basis, but had failed to remit the proceeds from most of the sales that had been made. When, after a substantial period of time had passed, petitioners had not received stock certificates representing their investments, they instituted this action against the issuer and its officers, and the officers of the underwriter. The United States District Court for the Southern District of New York, Sugarman, Ch. J., sitting without a jury (1) found that two officers of Armstrong & Co. were liable for the purchase price under the Securities Act of 1933, 15 U.S.C. 77a-77aa, but (2) dismissed the complaint against Precision Metal Products, Inc. and its officers, and (3) adjudged that the actions brought were not properly maintainable as class actions. Petitioners now appeal from parts (2) and (3) of the district court's judgment. For the reasons stated below, we agree with the disposition of these issues by the district court, and affirm the judgment below.
 
 
 2
 Early in 1961 the directors of Precision Metal Products, Inc. (Precision), a Florida corporation, decided that the company should 'go public,' and the search for an underwriter was commenced. The aid of a finder was enlisted and Precision eventually settled upon the underwriter recommended by him, Armstrong. However, before entering into an underwriting agreement with Armstrong, Precision's representative made an investigation of Armstrong's past history and its reputation in the industry. Evidently having been convinced that Armstrong was a reliable underwriter, Precision proceeded to execute an underwriting agreement with Armstrong on August 20, 1961. Thereafter Precision filed a Notification Form 1-A and Offering Circular with the Atlanta office of the Securities and Exchange Commission and was granted November 21, 1961 as the effective date for its offering. The issue had qualified as a Regulation A offering and thus was exempt from registration. See 15 U.S.C. 77c(b) and 17 CRF 230.251 et seq.
 
 
 3
 Suring the period prior to and immediately after the signing of the underwriting agreement Armstrong was in financial difficulty. In order to comply with the 2,000% Ratio of assets to liabilities required by the SEC, Robert Edens, President of Armstrong, borrowed from Martin Lasher, who later became an officer of Armstrong, over $100,000, and also borrowed stock certificates from him which were carried by Edens in Armstrong's own account. Lasher expected to be repaid out of two issues which Armstrong had contracted to handle but which had not been approved by the SEC. This was the situation when Precision executed the underwriting agreement.
 
 
 4
 On November 21, 1961 Armstrong began the selling of Precision shares to several of its custmers, including all of the petitioners. Armstrong had in the past acted as a sort of financial advisor to these purchasers and had helped them build investment portfolios, so, needless to say, they had confidence in Armstrong's advice and generally bougnt particular stocks solely upon Armstrong's recommendation. During the one month period to December 20, 1961, Edens represented to Precision that sales were going slowly because of the impending Christmas holidays and that he would wait until substantial proceeds were collected before he would make a remittance to Precision's transfer agent. In fact, during this time Armstrong was appropriating to its own use the proceeds of the Precision sales so as to ameliorate its own precarious financial situation. On December 19 or 20 Precision was told the issue was almost sold out. A week later Precision inquired when the proceeds of the sale could be expected and was informed that funds were coming in slowly. This shadow-boxing occurred for still another month though Armstrong forwarded three checks to Precision during this period: one for $10,000, dated January 23, 1962, which was returned to Precision because Armstrong had insufficient funds in the bank upon which the check was drawn; a second, a certified check, upon receipt of which Precision authorized its transfer agent to issue an appropriate number of stock certificates to Armstrong in its street name; and a third one, dated January 31, 1962, which could not be certified. Precision, on February 8, 1962, demanded an accounting from Armstrong and when such was not forthcoming filed a complaint with the SEC. Thereafter, the appellants timely commenced their actions in the court below.
 
 
 5
 In their complaints appellants first alleged that all of the defendants had violated either Section 12 or Section 15 of the Securities Act of 1933, 15 U.S.C. 77l, 77o. Section 12(2) of the Act provides civil relief in the nature of rescission to a purchaser whenever any person had sold or offered a security to that purchaser by means of a prospectus or oral communication which contains materially misleading statements or omissions;[1] Section 15 extends the class of persons against whom relief can be taken by including every person who controls, by stock ownership, agency, or otherwise, a person liable under Section 12.[2] In the present cases, appellants alleged violations of these sections because it was not disclosed in the offering circular for Precision stock or otherwise that the stock would not be delivered to the purchasers thereof or that the proceeds of sale would not be remitted to Precision by Armstrong. Appellants added at trial that Section 12 was further violated in that the offering circular failed to disclose that Armstrong would not consummate the sales transactions promptly. Although Armstrong was not a defendant in these actions, it is clear that Armstrong was a 'seller' of the securities within the Section 12 meaning of that term. See Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875 (2 Cir. 1943); Cady v. Murphy, 113 F.2d 988 (1 Cir.), cert. denied, 311 U.S. 705, 61 S.Ct. 175, 85 L.Ed. 458 (1940); see generally 3 Loss, Securities Regulation 1717-20 (2d ed. 1961). Hence defendants Edens and Lasher, officers of Armstrong, were implicated as persons controlling Armstrong within the meaning of Section 15.
 
 
 6
 The alleged liability of Precision was rooted in two theories: (1) Precision sold its stock through Armstrong and thus was a 'seller' within Section 12(2), or (2) Precision controlled Armstrong within the terms of Section 15. Defendants Tashman and Schwartz were officers, directors and principal shareholders of Precision and were alleged to be liable as controllers of Precision under Section 15. The 'Armstrong defendants' were both found by the district court to be liable to the purchasers under the Securities Act of 1933, and their liability is not an issue on this appeal. However, the so-called 'Precision defendants' all gained dismissals in the district court, and appellants seek reversal of the dismissal order.
 
 
 7
 Preliminarily we note our agreement with the district court that the failure to disclose in the offering circular and confirmation of sale that Armstrong would neither remit the proceeds of sales to Precision nor deliver the stock to the purchasers, and the failure to disclose that Armstrong would not consummate sales transactions promptly, were material omissions within the meaning of Section 12(2). The regulations provide that an omission is material if the undisclosed information concerns 'matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered.' 17 C.F.R. 230.405(1). Any average prudent investor would surely want to know whether his payment will be remitted to the issuer, whether a stock certificate will be issued, and whether the entire purchase transaction will be completed reasonably promptly. See Guardian Investment Corp. v. Rubinstein, 192 A.2d 296 (Ct.App.D.C.1963); cf. Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1 Cir. 1966). It follows, therefore, that the omissions involved in this case were material. Moreover, the omissions were of facts which existed at the time of sale, for it is clear from Armstrong's financial picture on November 21, 1961, and from Lasher's testimony that he expected his loans to be paid off from the proceeds of Armstrong's next two underwritings, that Armstrong did not intend to remit any proceeds (and therefore to issue any stock or to consummate any transaction promptly) until after it had cleared up its own financial situation. The district court so found and we have no reason to disagree with the finding. Furthermore, there is no doubt that appellants properly invoked Section 12(2), for though Precision was exempted from the registration provisions of the Act, 15 U.S.C. 77c, Section 12(2) applies as much to the circulars of an unregistered company as to the circulars of a registered company. Dale v. Rosenfeld, 229 F.2d 855, 857 (2 Cir. 1956). We also note our agreement with the district court's rejection of appellees' argument, that, as the offering circulars to which the omission in question were ascribed were not received by the appellants until their confirmations of sale were received (i.e., after the sale had been completed), the sale was not 'by means' of the circular. Were we to support appellees' contention we would, in effect, be erroneously introducing an element of reliance into the construction of Section 12(2). See Woodward v. Wright, 266 f.2d 108, 116 (10 Cir. 1959); Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 769 (D.Colo.1964); 3 Loss, Securities Regulation 1703, 1705-06, n. 72 (2d ed. 1961).
 
 
 8
 We now turn to the question whether Precision and its officers were 'sellers' or 'controllers' within the meaning of Sections 12 and 15. The district court found that Precision was the principal of Armstrong, for the 'best efforts' underwriting agreement constituted proof that an agency relationship existed between Precision and Armstrong. Thus that court held that Precision was a 'seller' under Section 12. The court alternatively found that Precision controlled Armstrong within the meaning of Section 15. However, Precision was held not liable to appellants under either Section 12(2) or Section 15 because, in each instance, it had carried its burden of proving that it did not know and in the exercise of reasonable care could not have known of the alleged omission. This being so, it followed that, inasmuch as Precision was not found liable under Section 12, defendnats Tashman and Schwartz, officers and directors of Precision, could not be liable under Section 15, for, Precision not being liable under Section 12, they could not have been controlling a person liable under Section 12.
 
 
 9
 We harbor serious doubts about the district court's conclusion that appellees were 'sellers' or 'controlling persons' within the meaning of the statute.[3] We do not reach this question, however, for assuming, arguendo, that appellees were indeed sellers or were in control, we agree with the district court that they have shown that they are entitled to the benefit of the defense provided in both Sections 12 and 15. Both sections specifically provide that a defendant may exculpate himself from liability by fullilling his burden of proving that he did not know, and in the exercise of reasonable care could not have known, in the case of Section 12 liability, of the alleged untruth or omission, or, in the case of Section 15 liability, of the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 
 
 10
 First of all, it seems evident that Precision and its officers had no actual knowledge that Armstrong would neither remit proceeds nor consummate the sales transactions promptly; for obviously it would have been against Precision's own interests to continue to retain Armstrong as its underwriter once these facts became known. Nevertheless, appellants contend that appellees had actual knowledge that the sales would not be consummated promptly, for appellees did not have the stock certificates for their stock issue printed until late in December of 1961, and the last sale here in question occurred on December 8, 1961. Ordinarily, perhaps, it could be inferred from the delay in printing the stock certificate that Precision did have knowledge that the sales would not be consummated quickly; however, here there were mitigating factors. At the times when these appellants were prejudiced by the alleged misleading omission, i.e., when they were sold the Precision stock between November 21 and December 8, Precision either did not know that any stock had been sold or it had been told by Armstrong that though some sales had been made funds from the purchasers had not yet 'come in.' Moreover, Precision had asked Armstrong, in late November, to examine and approve a sample stock certificate drafted by Precision, and Armstrong failed to indicate any suggestions relative to an approval of the sample until late December. This delay does not import guilty knowledge to Precision, for of course Precision felt no urgency in the matter; Armstrong had reported that no funds from sales had yet been received and therefore there was no need to hurry the printing of certificates.
 
 
 11
 Even though Precision had no actual knowledge at the time its prospectus was issued, or at the time Armtrong's sales were made, that Armstrong would not remit the proceeds of sales to Precision, or would not deliver certificates of stock to purchasers, precision was required, if it would avoid liability, to exercise reasonable care when the offering circular was prepared and distributed, and whenever representations were made, lest untrue statements be published or there be omissions which would cause statements that were made to be misleading statements. As there is no definition of 'reasonable care' in either the Act or the regulations, we may assume that the common law meaning of the Act or the regulations, we witnesses testified in the district court as to the precautions they had taken both before and after entering into Precision's underwriting agreement with Armstrong, and the district court was convinced that reasonable care had been shown by Precision in ascertaining the reliability of Armstrong-- the crucial investigation upon which Precision's own statements or omissions depended. Appellants contend that appellees did little more before signing the agreement than the minimum required by the SEC's regulations that any issuer who wishes to market a new issue of stock pursuant to Regulation 'A' must ascertain from the Local (here the Atlanta) and the New York regional offices of the SEC and from the National Association of Securities Dealers that his underwriter has no violations pending against him. See 17 C.F.R. 230.252(d), (e), and Notification Form 1-A, set out at 1 CCH Fed. Securities Law Rep. P7325. Considering the close watch the SEC and NASD keep over the financial position of underwriters (see, e.g., the requirement of a 2000% Ratio of assets to liabilities) we could almost say that an issuer who has complied with these requirements has exercised reasonable care in ascertaining the reliability of his underwriter. However, we need not so hold, for appellees did much more here: they saw six or seven prospectuses from other issues which were handled successfully by Armstrong, they verified three of them, and on a tour of over-the-counter dealers in New York City Precision's attorney received favorable responses to his inquiries about Armstrong's reputation in the industry.
 
 
 12
 Nevertheless, appellants contend that a 'person of ordinary prudence' before using Armstrong as an underwriter would have done even more. They suggest that such a person (1) would have investigated further into the situation to make certain rather than to assume that Armstrong's net worth was substantial; (2) would have examined Armstrong's financial statements on file with the SEC; (3) would have found out who the principals in Armstrong were; (4) would have investigated further into Edens's background; and (5) would have investigated the finder's background. We cannot agree with appellants. Precision, through its representatives, ascertained the stature of Armstrong among its peers. The reports from other underwriters and other issuers who had dealt with Armstrong were uniformly favorable to Armstrong. There is no reason to believe that if Precision had probed more deeply into the background and affairs of Edens or of the finder the shaky financial condition of Armstrong could have been discovered. Further inquiry into Armstrong's financial statements and further investigation into its net worth would have disclosed nothing. These items had been doctored so that they evaded discovery by even the SEC. There was nothing ascertainable by the Precision defendants which would have tipped them off to the fact that Armstrong was using borrowed stocks to make up the required 2000% Ratio between assets and liabilities. Thus up to the time of the signing of the underwriting agreement the Precision defendants had exercised the requisite reasonable care.
 
 
 13
 Nothing happened between the date of the signing of the agreement and the date of the last sale here involved which would have indicated to Precision that Armstrong was unreliable. As we have noted above, Precision had been advised that funds form the sales which had already been made had not yet come in, and that sales were generally slow due to the proximity of the Christmas holidays. The Precision defendants in the exercise of reasonable care could, without suspecting anything amiss, believe these representations. It was not until well after December 8 that anything happened that might cause them to doubt Armstrong's reliability. Therefore, we hold that the Precision defendants have made out good defenses under Sections 12(2) and 15.
 
 
 14
 In the lower court, appellants alleged another ground in support of a recovery against defendant Precision alone. Based upon a theory that common law principles of agency render Precision liable, appellants maintain that a 'best efforts' underwriting agreement gives rise to an agency relationship between issuer and underwriter, and that here their payments to Armstrong, Precision's agent to collect and remit proceeds of sales of Precision's stock to Precision, were payments to Precision. The district court, after undertaking an extensive analysis of the question, disagreed with appellants. We agree with the disposition of this claim by the court below.
 
 
 15
 In their briefs and at oral argument the parties represented to us that appellants were not maintaining that Precision was liable for Armstrong's default because Armstrong had apparent authority to bind Precision. They did not advance this contention because it is clear from the record that plaintiffs did not rely upon the existence of an agency relationship in making their purchases of Precision shares; indeed, there is no showing that they were aware that any agency existed. Appellants were all Armstrong customers who expected that Armstrong would be acting on their behalf or upon its own behalf. In fact, in the first instance, they looked to Armstrong rather than to Precision. To plaintiffs this was just another purchase transaction of shares on the advice of their broker, Armstrong.
 
 
 16
 Thus the question before us is whether Armstrong had actual authority so to bind. Actual authority granted to an agent to bind his principal is created by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware. Restatement Second, Agency 7, comment c; Seavey on Agency, 18, 20 (1964). Thus, in order to discover what authority Armstrong had in the present case, we must take into account all of its dealings with Precision, and especially the entire content of the underwriting agreement.
 
 
 17
 We turn first to the underwriting agreement. There are several aspects of this agreement which suggest that, in some particulars, an agency relationship is created thereby. However, as to the collection of the proceeds of stock sales and the issuance of stock certificates evidencing the sales, the terms of the agreement clearly indicate that Armstrong was its own master. The agreement provides that stock certificates will be issued five days after receipt of the price of the stock by the transfer agent, not five days after receipt of the price by Armstrong; the fee of $.45 Armstrong could pocket for each share Armstrong sold is characterized twice as a 'discount' and not as a 'commission,' indicating that Armstrong was expected to buy at a reduced price from Precision and then sell at the full price to its own customers; and, finally, the paragraph dealing with payment for and delivery of the stock explicitly states that upon receipt of payment the Company will deliver the purchased stock for the account of the underwriter. Of course this language implies that the issuer and underwriter had entered into a purchase and sale relationship rather than into an agency relationship. Moreover, the parties conducted themselves in that way. When the $10,000 which did reach Precision was turned over to the transfer agent an appropriate number of shares were issued to Armstrong in its street name ('Armco'). It seems clear to us that with respect to the collection of proceeds and issuance of stock Armstrong was not the agent of Precision.
 
 
 18
 We do not overlook the fact that in some cases it has indeed been said that a 'best efforts' underwriting agreement makes the investment dealer an agent for the issuer. Spence v. Balogh & Co., 216 F.Supp. 492, 494 (D.D.C.1962), aff'd on opinion below, 115 U.S.App.D.C. 209, 317 F.2d 909, cert. denied, 375 U.S. 823, 84 S.Ct. 67, 11 L.Ed.2d 58 (1963); SEC v. Investment Bankers, 181 F.Supp. 346, 348, n. 4 (D.D.C1960). Nevertheless, these two cases cited for the proposition that a 'best efforts' underwriting agreement creates an agency relationship between issuer and underwriter do not deter us from reaching the result we here reach. Spence is clearly distinguishable from the present cases in that there the underwriting agreement contained a statement that the underwriter was not purchasing stock for his own account. The court in Investment Bankers, to support its hypothesis that there was there an agency relationship, set forth neither the terms of the agreement nor the facts surrounding the issuer-underwriter relationship. Rather, we think the situation in the present case is one of the type concerning which Professor Loss has said:
 
 
 19
 The term 'best efforts' is also used in a broader sense to include all offerings through investment bankers, whether or not on an agency basis, otherwise than by firm agreements to purchase for resale. In this sense the term includes * * * (2) offerings through purchases and resales by a dealer firm acting as principal but without any commitment to buy more than it can resell * * *. 1 Loss,Securities Regulation 172, n. 24 (2 ed. 1961).
 
 
 20
 Thus we hold, in agreement with the district court, that Precision is not liable for Armstrong's default under any principle of common law agency.
 
 
 21
 The third and final question before us is whether the district court was correct in holding that these actions were not properly maintainable as class actions. The lower court concluded that appellants had failed to prove the existence of a class, and even if they had proven such existence, they had failed to show that, pursuant to Rule 23 of the Federal Rules of Civil Procedure, the persons alleged to constitute the class 'are so numerous as to make it impracticable to bring them all before the court.' It should be noted that this 'impracticability' requirement survived without alteration the transition from old Rule 23 to new Rule 23.
 
 
 22
 Without deciding whether appellants have failed to prove that a class actually exists, we hold that these actions were not properly maintainable as class actions because appellants did not show that the members of the alleged class are so numerous as to make it impracticable to bring them all before the court. What evidence there is in the record as to the size of the 'class' and the impracticability of joinder is pure speculation. For instance, appellants' assertion that the class may number one hundred or more is based on the guess that Armstrong sold 40,000 shares of Precision, and because most of the plaintiffs in these actions purchased Precision in blocks of 100 to 300 shares all the shares were purchased in similar blocks. Appellants have failed to place in the record any evidence (such as Armstrong's copies of sale confirmations) which might indicate that any purchasers not represented in the present actions did buy their stock in blocks of 100 to 300 shares each. Appellants point to an indictment pending in the Eastern District of New York in which Lasher, Edens, and Robert Schwartz (Armstrong's attorney) are charged with fraud in the sale of Precision stock. There the names of sixteen persons who are not parties to the present actions and who are said to have received Armstrong confirmations of sale for Precision stock are listed. That a group of sixteen more putative plaintiffs exists does not necessarily justify a class suit, especially where it appears that most, if not all, of said group live in the same geographical area as the plaintiffs. See e.g., Giordano v. Radio Corp. of Amer., 183 F.2d 558, 561 (3 Cir. 1950); Lipsett v. United States, 37 F.R.D. 549, 552 (SDNY 1965), appeal dismissed, 359 F.2d 956 (2 Cir. 1966); Coffman v. City of Wichita, 165 F.Supp. 765 (D.Kan), aff'd on opinion below, 261 F.2d 112 (10 Cir. 1958). But courts should not be so rigid as to depend upon mere numbers as a guideline on the practicability of joinder; a determination of practicability should depend upon all the circumstances surrounding a case. Hansberry v. Lee, 311 U.S. 32, 41, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Carroll v. Associated Musicians of Greater New York, 206 F.Supp. 462, 470 (SDNY 1962), aff'd, 316 F.2d 574 (2 Cir. 1963); Phillips v. Sherman, 197 F.Supp. 866 (NDNY 1961); Statler v. Mock,12 F.R.D. 409 (W.D.Pa.1952); but see Lipsett v. United States, supra. Furthermore, it is fundamental that those seeking to maintain an action as a class action must make a positive showing that it would be impracticable to deny the prayer. Phillips v. Sherman, supra, Statler v. Mock, supra. And see 3 Moore, Federal Practice 3422 (2d ed. 1967 supp.). Therefore, we agree with the district court that a class action is not here properly maintainable.
 
 
 23
 The judgment of the district court is affirmed.
 
 
 
 [1]
 15 U.S.C. 77l provides, in pertinent part:
 77l. Civil liabilities arising in connection with prospectuses and communications Any person who--
 (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragrahp (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recorer the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 [2]
 In 15 U.S.C. 77o it is stated that:
 77o. Liability of controlling persons
 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 
 
 [3]
 Because, as we point out in the text, infra, a 'best efforts' underwriting agreement is not always indicative of an agency relationship, it could be queried as to whether Precision was a 'seller' here. See, generally, 3 Loss, Securities Regulation 1716-20 (2d ed. 1961). It has been said that, absent a proven agency or a 'control' under Section 15, a purchaser of stock may sustain an action under Section 12 against his immediate seller only. Winter v. D.J. & M. Investment & Construction Corp., 185 F.Supp. 943, 946 (S.D.Cal.1960). Of course, the 'immediate seller' here was Armstrong, not Precision