**Sally A. DORNBERGER on behalf of herself and all other persons similarly situated, Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, et al., Defendants.**

**No. 95 CIV. 10374(LBS).**

United States District Court, S.D. New York.

Aug. 24, 1998.

As Amended Jan. 5, 1999.

Dickerson & Reilly, New York, Bradford D. Conover, for Sally A. Dornberger.

Wechsler Harwood Halebian & Feffer LLP, New York, Joel C. Feffer, Jeffrey M. Haber, for Sally A. Dornberger.

Proskauer Rose Goetz & Mendelsohn, New York, Bruce Fader, for Metropolitan Life Insurance et al.

SAND, District Judge.

This is an action brought by Sally A. Dornberger, a citizen of England and resident of Switzerland, against Metropolitan Life Insurance Company of New York ("MetLife") and against other directors, officers and employees of MetLife ("Defendants") on her own behalf and on behalf of all similarly situated persons who, during the period 1957 through the present, purchased personal life insurance or annuity contracts from MetLife's Overseas Operations in nine countries, allegedly without the approval of the relevant insurance regulatory authorities.

The Plaintiff makes claims pursuant to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and (d), as well as pendent claims for common law fraud, breach of contract, negligent misrepresentation, breach of fiduciary duty, violation of New York State Insurance Law §§ 4226 and 4224 and violation of New York Business Law § 349.[1]

The Plaintiff has moved pursuant to Fed. R.Civ.P. 23 for an order certifying this action on behalf of a class—with Sally Dornberger as its named representative plaintiff—consisting of: "All persons residing in any country, excluding residents of the State of New York, who, during the period 1957 through the present purchased from MetLife's Overseas Operations, personal life insurance or annuity contracts, the policy language, illustrations and premiums of which were never approved by the individual purchaser's country or state of residence." Plaintiff excludes those who have already died while the policy was in force. (Pl.'s Reply Brief at 1) For the reasons set forth below, the Court grants Plaintiff's Motion for Certification subject to certain strictures (to be discussed more completely *infra*), reshaping the class to comport with the requirements of Rule 23. As with any class certification, the definition of the class is conditional and may be modified by the Court at any time.

We certify a class of plaintiffs to include those with still in-force insurance policies or annuities and, conditionally, those with lapsed policies. Potential plaintiffs are to be divided into nine subclasses, one for each of the countries at issue in this litigation. We certify the class as to all eligible potential plaintiffs who bought their policies in Europe regardless of where they currently reside. In other words, the class is to include those plaintiffs, should they exist, who bought their

---

1. For a more detailed exploration of the substantive underlying claims to this Motion for Class Certification, see the March 27, 1997 Opinion of this Court granting in part and denying in part Defendants' Motion to Dismiss. *Dornberger v. Metropolitan Life Ins.*, 961 F.Supp. 506 (S.D.N.Y. 1997) (LBS). Plaintiff's claims under 18 U.S.C. §§ 1962(a) and 1962(b) were dismissed.

policies in Europe and now live in the United States. We acknowledge the Defendants' argument on the merits that these individuals may not have been aggrieved, but we cannot accept such a contention without additional evidence obtained through the discovery process. Furthermore, we sever Mrs. Dornberger's claim for relief under N.Y. Insurance Law § 4226 as being distinct from the certified class action mechanism.

## BACKGROUND

■ In an Opinion dated March 27, 1997, familiarity with which is assumed, this Court detailed much of the factual history and claims of this case as alleged in Plaintiff's Amended Complaint and RICO Statement. Determinations of class action certification are properly based on the allegations set forth in the complaint. *Shelter Realty Corp. v. Allied Maintenance Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978). Therefore none of the fact allegations contained in Plaintiff's pleadings, while accepted as true for purposes of this certification motion, should be considered as definitive findings of fact on the merits of this action. The putative class at issue in this Motion for Certification arises out of the sale of insurance and annuities by MetLife in Europe over the last four decades. In brief, Plaintiff tells the following story (Pl's Mem. of Law at 3–8.):

MetLife, a New York based insurance company, began sales of insurance in Europe to United States military personnel and their dependents in 1957. According to Plaintiff, Defendant MetLife subsequently solicited and sold insurance products to non-military personnel, including American citizens resident abroad and European nationals, in contravention of its agreement with the military and in violation of the national laws of nine of the states[2] in which these sales were made. Plaintiff, a British citizen residing in Switzerland for the last sixteen years, purchased two insurance policies from MetLife through its agent Lola Cular, one policy in 1991 and one in 1993, insuring the life of her husband, an American citizen resident in Switzerland. (Pl.'s Notice of Mot. Exs. H & I.) Plaintiff

alleges that these sales were made illegally in violation of Swiss insurance laws and regulations and that Defendant was aware of and deliberately concealed the illegality of such sales.

Plaintiff alleges that the two insurance policies she purchased were part of a far-reaching scheme allegedly perpetrated by the Defendant to sell insurance without the requisite authorizations and licensing from European regulators. According to Plaintiff, the alleged scheme was carried out through a pattern of fraudulent omissions and misrepresentations made by means of telephone marketing, mailing, advertisements and face-to-face solicitations by agents following a set of uniform guidelines for such sales disseminated knowingly by the New York office. Defendants object to this characterization and suggest, instead, that sales agents in Europe acted merely as conduits for business to be funneled to the New York office via so-called "post office procedures." (see Aff. of Arlette Mooney, Director of Corporate Underwriting Policies and Procedures, appended to MetLife's Sur–Reply Decls. Vol. II)

Beginning in 1994, MetLife suspended its Overseas Operations, withdrawing its local representatives from Europe, allegedly in an effort to avoid facing liability for its illegal sales which, by this point, had come under scrutiny in various countries, including Switzerland. Defendants also are alleged to have represented fraudulently that a New York State franchise tax was required to be paid on all policies and that the premiums paid by European purchasers which had been priced to include such taxes were never paid to New York State. Furthermore, Plaintiff alleges that Defendant fraudulently represented to them that they would be provided with permanent local representatives to administer their policies and that the premiums for the insurance reflected the costs of such service. In 1995 Plaintiff brought suit against MetLife on her own behalf and on behalf of nearly 100,000 persons (this number has since been revised downward) to whom Met-

---

**2.** Plaintiff's action originally sought to include additional countries but the number has been reduced to nine by stipulation. (Tr. of July 13, 1998 at 3)

Life had allegedly sold illegal life insurance and annuities in Europe since 1957.

## RULE 23

Federal Rule of Civil Procedure 23 provides that "as soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed.R.Civ.P. 23(c). In this Circuit, the requirements of Rule 23 are to be read liberally and flexibly. *Green v. Wolf Corp.*, 406 F.2d 291, 297 (2d Cir.1968) (securities class action certified). Though there is no caselaw in this jurisdiction dealing specifically with the construction of class action requirements in this type of suit for the sale abroad of allegedly illegal and unauthorized insurance, we apply the same standards used generally in other contexts where there are potentially numerous injured plaintiffs, each with relatively small claims against a common defendant. In considering the certification of a potential class, the district court is not, at this stage, to assess the merits or the substance of the claims at issue but, rather, is to limit its inquiry to the satisfaction of the requirements under Fed.R.Civ.P. 23. Of course, a sensible appraisal of the class involves some reference to the substance of the case, especially in order to assess questions of commonality or predominance. However, despite parties' extensive briefing of the merits of the case, we circumscribe our present inquiry to the essentials for class certification.

Rule 23 provides that plaintiffs seeking to certify a class satisfy the four prerequisites to certification set out in Rule 23(a) and, in addition to meeting these requirements, a class action must also qualify under one of three subdivisions of 23(b). *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (outlining and summarizing the test imposed by Rule 23). The Rule reads as follows:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Furthermore, Plaintiff claims to satisfy the third prong of Rule 23(b): [3]

The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Against the backdrop of the requirements of Rule 23, we must conduct our analysis of the would-be class suggested by the Plaintiff's Motion and therefore treat each element seriatim, though certain of the relevant factors, such as commonality and predominance, overlap significantly. Though this is not an inquiry on the merits of any claim, it is incumbent upon us, to the extent necessary, to look to the substance of the case to understand better the application and implementation of the class action procedures during the ensuing course of this litigation.

---

**3.** Rule 23(b)(3) "encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bring-

ing about other undesirable results." Advisory Committee Note to the 1966 Amendment to Rule 23. See Wright Miller & Kane, Federal Practice & Procedure: Civil 2d § 1777 (1986).

*Numerosity & Impracticability*

 Although Plaintiff need not show the exact number of potential members of the class—which the Dornbergers cannot do at this stage—she does bear the burden of showing numerosity and the impracticality of joinder. *Demarco v. Edens*, 390 F.2d 836, 845 (2d Cir.1968). Approximately 75,237 policies are estimated at this pre-discovery stage to have been sold through MetLife's Overseas operations.[4] (Wilson Aff. at ¶ 2.) Of this number, 12,792 remained in force as of November 1997. Of these, 6,611 have been identified as military policies or those whose premiums were paid by "government allotment" and those coded "military at issue." This leaves 6,181 non-military policies in force as of November 1997 of which 1,238 are held by individuals with a last known address in Europe. MetLife informs us, however, that "readily accessible MetLife data does not identify the country where a particular insurance policy was purchased." (Wilson Aff. at ¶ 3.)

Though MetLife argues that the significant number before the Court on this Motion is not the circa 75,000 policies sold but the 1,200 policies belonging to those still residing in Europe (Tr. of July 13, 1998 at 45), it does not significantly object to class certification on the grounds of numerosity. We are therefore bolstered in our conclusion that the potential class—even with the emendations we propose below—is sufficiently numerous to make joinder impractical and to satisfy this prong of Rule 23(a).

Although there is no "magic number that breathes life into a class," *In re NASDAQ Market–Makers Antitrust Litigation*, 169 F.R.D. 493, 508 (S.D.N.Y.1996), the threshold for impracticability of joinder seems to be around forty, a requirement which has been easily satisfied here. Wright Miller & Kane, Federal Practice and Procedure: Civil 2d § 1762 (1986); *see Korn v. Franchard*, 456 F.2d 1206, 1208 (2d Cir.1972) ("Forty investors have been said to represent a sufficient-

ly large group 'where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions.'" (citations omitted)).

At this stage in this litigation, when precise numbers of sales for each country have not yet been determined, the record does not permit a denial of certification on the basis of numerosity. Plaintiff has adequately and obviously demonstrated that, at this point, there might exist a plethora of potential plaintiffs—probably too large to be joined as individual plaintiffs—who bought policies through MetLife's Overseas Operations.

We will treat the question of subclasses and class scope below.

*Commonality & Predominance*

 The commonality and predominance requirements of Rules 23(a)(2) and 23(b)(3) present a more difficult hurdle. *Amchem Products v. Windsor*, —— U.S. ——, ——, 117 S.Ct. 2231, 2243, 138 L.Ed.2d 689 (1997). The second prong of Rule 23(a) necessitates a common question of law or fact to unite the potential plaintiffs in the class. Rule 23(b)(3), the tougher of the two standards, requires that such question or questions predominate over those issues unique to individual plaintiffs. *Marisol v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997) (per curiam); *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir.1968). Generally speaking, if the action complained of on behalf of the putative class members arises out of a single set of operative facts, then the commonality requirement will have been satisfied. If that common nucleus of operative facts forms the central issue in the case, even if individualized issues of proof are present, the predominance hurdle will have been cleared.

 The difficulty in ascertaining commonality and predominance here is two-fold. There are divergences in: (1) laws of nine European countries;[5] and (2) representa-

---

4. Raw data on MetLife Overseas Operation sales are appended at Exhibit A to Plaintiff's Notice of Motion. An analysis of this information can be found as part of Defendant MetLife's Declaration with Respect to Class Certification, Volume 2, Wilson Affidavit.

5. For example, the parties engage in a lengthy debate in their submissions over the question of whether Swiss insurance regulations govern sales to "domiciliaries" or to "residents." The fact that Switzerland's statute may, arguendo, govern domiciliaries and another country's rules

tions made to individual purchasers. The question is are these differences substantial enough to destroy the basis for commonality and do they undermine a finding of predominance in a case predicated upon fraud claims.

Plaintiff asserts that the differences in both cases are insufficient to prevent certification. She outlines three pages of potential common questions in her papers.[6] (Pl.'s Mem. of Law at 13–16.) She argues that, regardless of the particularities of the insurance regulations of individual nations, the requirement of governmental authorization and the failure to obtain it was common to all the countries. The alleged scheming on the part of the Defendants to do whatever was necessary to operate covertly constitutes the predominant act. Furthermore, she asserts that since the remedial rights of potential plaintiffs and the liability of defendants would be governed by New York law, commonality is present.

Defendants argue that the need to prove the laws of nine different jurisdictions, as this Court has previously determined would be required,[7] and the investigation of individual incidents of misrepresentation to differ-

ently situated plaintiffs defeats commonality.[8] In certain countries, they point out, MetLife had obtained letters of authorization from government authorities. MetLife's alleged activities might have been legal in certain countries, illegal in others and not subject to enforcement in yet a third category of countries. It sold to different types of customers, including American military personnel and European nationals. There was no common sales practice, rather, individual agents, according to Defendant, made varying representations to clients. "The individualized nature of these inquiries would undermine any efficiency to be gained by the class action mechanism and would convert this proceeding into thousands of mini-trials, preceded by thousands of depositions." (Def.'s Brief at 36.) To underscore its contention that there exists no common question of law or fact, Defendant has supplied the Court with voluminous affidavits of legal experts from eight countries, suggesting that MetLife's activities were, most likely, not illegal or, in the alternative, that the facts raise complicated and disparate issues of foreign law.[9] (Met-

may govern residents, impacts on issues of commonality and predominance as regards insureds whose policies were purchased in different countries.

**6.** Among Plaintiff's questions are the following:

What action did defendants undertake, if any, to ensure compliance with the laws and regulations of foreign countries applicable to defendants' business activities overseas? What actions did defendants undertake during the 35 years of operations overseas including the termination of MetLife's European Sales Representatives? Does MetLife's Overseas Operation constitute an Enterprise as defined in 18 U.S.C. § 1961? Did defendants, as fiduciaries, fail to disclose material facts to plaintiffs before and after plaintiffs' purchase of MetLife financial products and services? Are plaintiffs entitled under common law fraud to rescissionary damages, i.e. a return of their premiums?

**7.** See Dornberger v. Metropolitan Life Insurance Company, et al., 961 F.Supp. 506, 533 (S.D.N.Y. 1997) ("the existence of illegality will necessarily be determined by European law, because Europe is the place where MetLife allegedly engaged in the sale of insurance policies without compliance with applicable insurance regulations. The effect of such illegality (i.e. whether rescission is a proper remedy) will be determined under the law

of the jurisdiction which is selected under conflicts analysis...[A]t this stage of the litigation that jurisdiction is New York.")

**8.** Defendants, as if to undermine their own argument that, because of the necessity of inquiring into the variations in European insurance laws, the class may not stand, suggest that "because MetLife's policies were approved by the New York Department of Insurance and complied with the strict requirements imposed by New York law, it is far from clear what benefits, if any, the insurance laws of each foreign country confer beyond those provided by New York laws..." Defendants, however, cannot have it both ways—arguing for the exclusivity of New York law and for the use of the differences in foreign law to defeat class certification. Despite Defendants' apparent espousal of New York law, we nonetheless examine the effect upon the class action of requiring the proof of law from nine jurisdictions.

**9.** The question of certification of the class arises independently of and prior to any inquiry on the merits of the case. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 175, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine wheth-

Life's Brief at 33) ("[E]ven in the absence of specific letters of authorization, different countries have different preconditions as to when a foreign insurer will be held generally to be subject to its licensing requirements.") To refute these affidavits, Plaintiff has filed competing affidavits from foreign legal experts who seek to demonstrate that Met-Life's activities would, in fact, be found to have been illegal under the relevant insurance laws. Defendants point to the disagreement between their affidavits and those of plaintiff to underscore the myriad sticky issues of foreign law which, they claim, destroy commonality.

Defendants' objections to the commonality of plaintiffs' claims is tied inextricably to the question of predominance. They argue that, even were there a common question of the legality of MetLife's operations, potential differences in the nature of the misrepresentations made by agents to customers and variations in national laws prevent a finding that the common issues *predominate.* Rule 23(b)(3) demands that there be not only common questions but that these common questions predominate over any individual questions specific to each plaintiff. The predominance inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy...[and] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem v. Windsor,* — U.S. —, —, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997).

To untangle this Gordian knot of commonality and predominance, we must inquire into the likely nature of proof which will be required in this case when it is tried on the merits in order to determine whether individual issues will eventually overwhelm the common ones. We conclude that common

questions of law and of fact are sufficiently present to sustain certification. By their very nature, RICO claims allege a scheme or conspiracy. That is not to say that any time a RICO claim is alleged, a grant of certification is automatic or easy. In fact, where the underlying claims are fraud claims, as here, the inquiry becomes a complicated weighing of the need for individualized means of proof against the advantages of the class action device. *See, e.g., Andrews v. AT & T, Co.,* 95 F.3d 1014, 1024 (11th Cir.1996) ("Even if it could be shown that the appellants were engaged in a scheme to defraud and made misrepresentations to further that scheme, the plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages.")

*Application of Foreign Law*

In sum: The common legal question is whether Defendants conspired knowingly to defraud by selling insurance products without authorization from the Swiss and eight other governments, and whether purchasers of insurance and annuity products from Met-Life's Overseas operations are entitled to rescission under New York law of part of the premiums paid to MetLife.[10] The pleadings offer a common factual predicate, namely Defendants' knowing operation of an illegal insurance business.

Though the need to apply foreign law raises complex issues of proof and has already occupied the attention of numerous legal experts, it is does not impede a finding of a common factual and legal predicate. The caselaw in this area runs the gamut. There are those cases where the disparity of facts or the variety of law were such that individual issues overwhelmed the common nucleus.[11]

---

er it may be maintained as a class action .") We, therefore, read parties' affidavits on foreign law, not for the merit of their assertions, but as illustrative on the questions of commonality and predominance. (Tr. of July 13, 1998 at 32)

10. It was held in this Court's previous Opinion of March 27, 1997, that Plaintiffs, if they prevail, would be entitled to partial but not full rescission of premiums paid, with allowance for value of insurance protection already provided.

11. See, e.g., *Castano v. American Tobacco Company, et al.,* 84 F.3d 734 (5th Cir.1996) (district court failed to consider how variations in state law would affect predominance and superiority); *Walsh v. Ford Motor Company,* 807 F.2d 1000 (D.C.Cir.1986) (district court required to inquire whether state law differences precluded such a finding for class of plaintiffs who had experienced "park-to-reverse" incidents in Fords); see also *Mechigian v. Art Capital Corp.,* 612 F.Supp. 1421, 1432 (S.D.N.Y.1985) (on motion to dismiss

The need to apply differing statutes can render the management of a class impossible and place the interests of potential plaintiffs at loggerheads rather than in harmony. Then there are myriad examples of those cases where the common nexus was strong enough to withstand the difficulties imposed by individual differences.[12]

A discrete inquiry under the insurance regulations of nine countries is complicated but not unmanageable as evidenced by the affidavits submitted with this Motion. We find that Plaintiffs have sufficiently alleged a common course of conduct on the part of MetLife to satisfy the requirements of commonality and predominance even though this case will necessitate particularized inquiries into different foreign laws. Where, under the circumstances, it would be consistent with the purposes of the class action device and comport with the requirements of Rule 23, the need to construe foreign law, even for nine countries, does not destroy commonality or predominance. "Issues relating to defendants' conduct will be common to the class regardless of the law to be applied." *In re Crazy Eddie Securities Litigation*, 135 F.R.D. 39 (E.D.N.Y.1991) (certifying class); see also *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87 (S.D.N.Y.1981) (even where there are factual differences, a common question of liability can yield a finding of predominance). Common questions may predominate where defendants are alleged to have engaged in a common scheme to defraud. The central, common and predominant issue, which is covered by New York law, is that of liability and damages, if any. We do not envision that even if proof in this case will require "thousands of individualized inquiries (including the necessary discovery) into the mental state of each policyholder at the time of application to determine the applicant's domiciliary, military and/or citizenship status" (Def.'s Brief at 40) that this will

be unduly onerous in this era of computerized record-keeping. While the need to decide and apply issues of foreign law presents a surmountable difficulty, the potential divergence of interests between potential class members which may arise subsequent to such determination necessitates the creation of sub-classes.

*Individual Representations*

We further find that the need to prove individual reliance and misrepresentation to satisfy Plaintiffs' fraud claims does not defeat the Motion to Certify. Formation of the class is based upon Defendants' alleged course of consistent conduct which we find would constitute, if proven, a common set of facts. *Cf. Marcial v. Coronet Insurance Co.*, 880 F.2d 954, 956 (7th Cir.1989) (certification denied where class derived from persons who were denied indemnity after failing polygraph test because of a lack of evidence that rejection of coverage predicated upon failure of polygraph).

Plaintiff contends that the sale of a similar product by common means, the so-called Field Underwriting Guide employed by Defendants, as described by the sales agents from various countries, gave rise to sufficient commonality. (Pl.'s Reply Ex. C) They contend that misrepresentations to purchasers was a common fact of MetLife's business overseas and that the uniform act of falsely representing themselves to be operating legally abroad overrides the specifics of the misrepresentations.

Plaintiff analogizes the instant action to the more common securities fraud class actions where the misrepresentations common to all plaintiffs in a class are contained in a written prospectus. *See e.g., Green v. Wolf*, 406 F.2d 291 (2d Cir.1968). The *Green* court held that despite individual questions of reliance, a common issue of misrepresentation existed adequate enough that the district

court held that with no single law governing the entire class Rule 23 treatment likely not to be warranted).

12. See, e.g., *Somerville v. Major Exploration*, 102 F.R.D. 500, 503 (S.D.N.Y.1984) ("In cases where a common course of conduct by defendants can be shown, courts have been consistently unwilling to consider individual issues of materiality and reliance as matters requiring repeated demonstrations of subjective proof."); *Shankroff v. Advest*, 112 F.R.D. 190, 193 (S.D.N.Y.1986) ("Common questions may predominate where there exists a common course of conduct even though there is not a complete identity of facts.").

court had not abused its discretion in certifying the class. "We see no sound reason why the trial court, if it determines individual reliance is an essential element of the proof, cannot order separate trials on that particular issue, as on the question of damages, if necessary." *Green* at 301. In the securities fraud context, the prospectus creates a unifying device, permitting the common issues to predominate over the individual issues despite other material variations. Here, Plaintiff suggests that the Uniform Sales Manual distributed by MetLife to its agents in Europe was, in fact, akin to the prospectus and constituted a similar written device for the perpetration of a fraud. However, Plaintiff neglects to point out that these sales manuals were not sent to the potential plaintiffs in this litigation but went only to MetLife sales agents. This would be analogous to the situation in the securities context where a prospectus containing misrepresentations is sent to brokers only—never shown to their clients—but used by the brokers to encourage individuals to buy the securities. However, claims under the federal securities laws, unlike the common law of fraud invoked by the Dornbergers, sometimes eschew the need for proof of individual reliance in favor of a fraud-on-the-market analysis. *See In re Motel 6 Securities Litigation,* 1997 WL 154011 (S.D.N.Y.1997) (common law fraud cases are to be distinguished from those cases that involved a fraud on the market theory or other theory "in which reliance or a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims"). Hence we are faced with the question whether the MetLife sales literature, including the Uniform Sales Manual, distributed to its agents—and containing potentially fraudulent misrepresentations—can be used to meet the tests of commonality and predominance. We find that it does.

*Typicality*

■ The third prerequisite under Rule 23(a) for maintaining a class action is "typicality." Generally speaking, the commonality and typicality requirements tend to merge into one another because the claims of the class and those of the named plaintiff are expected to be interrelated; *Rossini v. Ogilvy & Mather,* 798 F.2d 590 (2d Cir.1986) (commonality and typicality tend to merge); *Marisol* at 376. A plaintiff's claim meets the typicality requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory." *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 98 (S.D.N.Y.1981). If, by advancing their own interests, the named plaintiff also advances the interests of the proposed class then the typicality requirement will have been met. *Green v. Wolf Corp.,* 406 F.2d 291, 299 (2d Cir.1968), cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

■ Defendants challenge Mrs. Dornberger's typicality as the named plaintiff of the putative class. They argue that she is atypical because she is (1) domiciled in Switzerland; and (2) not similarly situated to those potential plaintiffs who have returned to the United States; and (3) finally, because she allegedly ratified her voidable insurance policies rendering her potentially ineligible for the remedy of rescission.

We find that at this pre-discovery juncture, Plaintiff is a sufficiently typical representative even where common law issues are present requiring individualized means of proof. *In re Baldwin–United Corp. Litig. (Linton v. Shearson Lehman/American Exp.),* 122 F.R.D. 424 (S.D.N.Y.1986) (plaintiffs satisfied typicality requirement by showing that the same allegedly unlawful conduct affected all members of the prospective class). This Plaintiff satisfies the typicality requirement because her allegations are not based on conduct unique to her. The fact that her alleged ratification of the policy might preclude her right to damages does not destroy typicality nor does the fact that she still resides in Europe. These are points of potential difference which, should they arise, can be resolved later. With regard to Plaintiff's status as a Swiss domiciliary, we find that this does not undermine typicality, but that the class would be best served by the creation of subclasses.

82

### Adequacy & Subclasses

■ Rule 23(a)(4) requires that the plaintiffs be adequately representative of the class. That means that the plaintiffs must show that there is an absence of antagonistic interests between them and the potential class members and, second, that the class counsel is "qualified, experienced and capable." *Ross v. A.H. Robins Co.*, 100 F.R.D. 5, 7 (S.D.N.Y.1982); accord *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992).

On the record before us there is no indication of inadequacy on the part of plaintiffs' counsel, who has diligently prosecuted the case to date and must continue to do so consonant with the strictures of Rule 23. We reject Defendants' contention that Plaintiff is either unwilling or unable to finance this litigation and the notice requirements. Furthermore there is no evidence of any antagonistic interests between the Dornbergers and those of the potential class that cannot be resolved by means of subclasses.

■ Subsection (c)(4) of Rule 23 authorizes this Court to allow a class action: (1) to be maintained with respect to particular issues; and (2) to divide the class into appropriate subclasses. We employ both these devices here in order to render the class more manageable and to safeguard the interests of litigants as members of the class. Given the peculiar differences which separate potential plaintiffs—differences which do not defeat commonality but which impose significant hurdles to adjudication by means of a single, large class—we invoke our power to "treat common things in common and to distinguish the distinguishable." Wright Miller & Kane, Federal Practice and Procedure: Civil 2d § 1790 (1986) (quoting *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)).

We find subclasses to be a useful and profitable procedural device early in this litigation as a means to focus discovery and render this case more manageable given the separate factual inquiries made necessary by the application of foreign law. We reject Plaintiff's argument that it is too soon to create subclasses. The distinctiveness of these various subgroups has already crystallized with some degree of clarity. *In re School Asbestos*, 789 F.2d at 1011 (the designation of subclasses or the decertification of an unmanageable portion of the class can be in order). By creating appropriate subclasses, headed by a suitable representative, well in advance of trial, "the district court will be able to focus discovery on those issues, sparing the parties from directionless and haphazard discovery. In addition, the identification of subclasses will allow the district court to weed out, and, if necessary, dismiss those claims for which no named plaintiff is an adequate representative." *Marisol*, 126 F.3d 372 (2d Cir.1997) (certification of subclasses required in sprawling class action involving New York City's child welfare system). What the *Marisol* case makes clear is that subclasses are an important—even vital—mechanism for the efficient and effective management of the class, especially where myriad factual and legal issues arise out of the common scheme of events as is the case before us. The potential conflicts to be avoided by the creation of classes are "real probabilities and not mere imaginative speculation." *Robertson v. National Basketball Association*, 389 F.Supp. 867, 898 (S.D.N.Y. 1975).

Mrs. Dornberger's claims, though common to the class, hinge upon MetLife's operation without authorization under Swiss law. The claims of the class will inevitably implicate the insurance regulatory regimes of nine nations. If MetLife is subsequently found, for example, to have been operating legally in Switzerland and is free of liability for Swiss sales, Mrs. Dornberger will no longer be a typical plaintiff capable of adequately representing the interests of class members in a country where MetLife is found to have acted without appropriate authorization. Therefore we conclude it is preferable to have a typical and adequate named-plaintiff to represent each of nine subclasses—one for each country involved—with Mrs. Dornberger as the named plaintiff for the Swiss class. Under the requirements of Rule 23, each of the subclasses must independently meet the requirements for a class action. The formation of these subclasses will therefore necessitate the designation of a representative,

typical, named plaintiff from each of the eight countries other than Switzerland to head each sub-class.

*Superiority*

Finally, Rule 23(b)(3) requires that the District Court determine that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Where, as here, class members are likely to be sufficiently numerous and to possess relatively small claims unworthy of individual adjudication due to the amount at issue in each one, the mechanism of the class action is deemed to be superior. *Green v. Wolf Corp.,* 406 F.2d 291 (2d Cir. 1968). Despite the factual complexities present in the case and the eventual need for individualized issues of proof, we find that the management of the case would be neither unmanageable nor unworkable.

*The Scope of the Class*

Plaintiff seeks here to certify a class of approximately 75,000 potential plaintiffs who purchased from MetLife's Overseas Operations. Plaintiff does not aim to include former MetLife clients who have died and whose policies were paid out to beneficiaries. Defendants argue that, if certified, the scope of the class should be limited to exclude: (1) purchasers who have since left Europe and returned to the United States; (2) purchasers whose policies are, for whatever reason, no longer in force and have lapsed. Defendants argue that, at least with regard to certain claims such as Guaranty Fund Protection, lack of local service and the failure to pay franchise taxes (MetLife's Brief at 50) those residing in the United States are not similarly situated to those still in Europe. They also contend that those with lapsed policies have no claim for either rescission or reinstatement regardless of Defendants' liability.

At this early stage in the litigation, we cannot definitively exclude potential plaintiffs who currently reside in the United States. While Defendants may be correct in arguing that customers of MetLife who currently reside in the United States probably have local representatives to service their policies, unlike their counterparts in Europe, it is not clear that these potential plaintiffs did not, nonetheless, suffer some injury by virtue of allegedly having been fraudulently induced to purchase potentially defective policies. It is not clear, without the enlightenment the discovery process may provide, whether such plaintiffs would have any claim for damages upon a finding of liability. We have already held that an action for rescission does not necessitate a showing of injury in the traditional sense which is required in an action for damages. *Dornberger v. Metropolitan Life Insurance Co.,* 961 F.Supp. 506, 543 (1997). For this reason, we cannot now exclude them from the class and therefore conditionally certify their inclusion subject to a further post-discovery showing. Looking ahead to the trial of this case on the merits, we envision potential scenarios where these subgroups might have distinct damage claims (e.g. as a result of the loss of value of having a personal service representative). It is common in class action litigation to have varying damage claims among class members, but this does not create a bar to certification of the class at the outset.

We also include in the class, conditionally, those putative plaintiffs with lapsed policies. We reject Defendants' argument based on *Wall v. Metropolitan Life Insurance Co.,* 239 A.D. 560, 268 N.Y.S. 129 (2d Dept.1933) that damages are not available for fraudulent misrepresentation to those plaintiffs who rescinded the insurance contract on other grounds. In the *Wall* case, "there [was] no rescission, no admitted illegality, and no established fraud." *Id.* at 561, 268 N.Y.S. 129. That is not necessarily the case here where plaintiffs are still in the process of attempting to prove an alleged fraud and illegal enterprise. Though, at first blush, it might seem that those holding lapsed policies have no claim for rescission or reinstatement, if, in fact, their policies lapsed for non-payment and it can be shown that the premiums were overpriced, such individuals might, indeed, have a claim. It can be analogized to the situation where a purchaser cannot afford to make payments on what she supposes to be a Cadillac. She fails to meet her obligations under the car contract and it is repossessed. Without knowledge or notice at the time of

purchase, she subsequently discovers that her payments had been inflated and overpriced because she had been driving a Pinto though paying for a Cadillac. Although she no longer has the car in her possession, this gullible driver might be entitled to a claim for damages. Because this is a question which goes too far into the merits of the case, we cannot now exclude the claims of lapsed policy holders and include them in the class.

*Certification of Claims*

New York Insurance Law § 4226, which addresses the misrepresentations of insurers, cannot, as a matter of New York law, serve as a basis for recovery in a class action[13] because New York CPLR § 901(b) prevents the maintenance of a class action pursuant to a statute which provides for the recovery of a specific penalty and does not expressly permit class actions. *In re Empire Blue Cross & Blue Shield Customer Litigation,* 164 Misc.2d 350, 622 N.Y.S.2d 843 (N.Y.Sup.1994) (purchasers of health insurance policies not entitled to certification of plaintiff class in suit against insurer under Insurance Law for fraudulently misrepresenting its financial condition, where section did not contain necessary express clause allowing damages to be recovered in class action). This particular statute expressly provides that it shall be read "in accordance with the provisions of the civil practice law and rules." New York CPLR. 901(b); see McLaughlin, Practice Commentary to New York CPLR § 901(b) at 327–28 in N.Y. Civil Practice Law and Rules § 901(b) (McKinney 1991). Whereas this Court is bound by Fed. R.Civ.P. 23 in this action, the strictures of New York's CPLR § 901(b) do not contravene any federal rule. This situation does not warrant an invocation of the Supremacy Clause or a discussion of the overlapping scope of CPLR § 901 and Rule 23. It would be patently unfair to allow plaintiff an attempt at recovery in federal court for a state law claim that would be barred in state court. *Brame v.. Ray Bills Finance Corp.,* 85 F.R.D. 568 (N.D.N.Y.1979); *Wesley v. John Mullins & Sons, Inc.,* 444 F.Supp. 117 (E.D.N.Y.1978). We therefore conclude that claims under N.Y. Insurance Law § 4226 cannot be certified.

We reject Defendants' request to decertify other claims made by Plaintiff. Prior to discovery, when we do not have a realistic sense of Defendants' potential liability, it is premature to reject other causes of action. Defendants suggest that MetLife had authorization to operate in certain countries and that its operations in other countries were *de minimis* and therefore did not require any authorization. (see, e.g., Kuhn Aff. appended to MetLife's Sur–Reply Decls., Vol. I.) Defendants further contend that no one has been harmed, all policies have been honored and that the action is spurious as plaintiffs would not be entitled to any damages. Of course, plaintiffs dispute this reasoning. But this is not an inquiry upon the merits nor a prediction of the eventual outcome of this suit. Plaintiff has carried her burden of fulfilling the requirements of Rule 23 and need not now prove the merit of each cause of action prior to discovery. To sever additional, disputed claims without a more fully developed record would unfairly discriminate against potential class members. The validity of Plaintiff's claims will be addressed in subsequent dispositive proceedings.

## CONCLUSION

For the foregoing reasons, we certify the class as to:

(1) Potential plaintiffs who purchased still in-force insurance or annuities products from MetLife's Overseas Operations, from 1957 through 1994 in Switzerland, France, Italy, Spain, the Netherlands, Belgium, Norway, and Greece, and from 1967 through 1994 in the United Kingdom; conditionally as to potential plaintiffs who purchased lapsed insurance or annuities products from MetLife's Overseas Operations, from 1957 through 1994 in Switzerland, France, Italy, Spain, the Netherlands, Belgium, Norway, and Greece, and from 1967 through 1994 in the United Kingdom.

(2) This potential class is to be divided into nine subclasses with named plaintiff(s) com-

---

**13.** Though raised by Defendants earlier Motion to Dismiss, the applicability of § 4226 as a class action device has only now become ripe for adjudication. *Dornberger,* 961 F.Supp. at 547, n. 42.

porting with the requirements of Federal Rule of Civil Procedure 23 to be designated to represent each one;

(3) Plaintiff's claim for relief under N.Y. Ins. Law § 4226 is to be severed. All other claims remain intact at this point.

The parties are hereby ordered to submit a proposed discovery schedule in this matter within thirty (30) days of the date of this Opinion. In this proposed schedule Plaintiff should specifically indicate what discovery and other proceedings are required to ascertain the identity of such class representatives and a time-frame for that to take place. The Plaintiff shall inform the Court how long she requires for the creation of the subclasses as outlined in this Opinion.