Catherine MARTIN, et al., Plaintiffs,

v.

**SHELL OIL COMPANY and Motiva Enterprises, LLC, Defendants.**

No. Civ.A.3:99CV1428(JCH).

United States District Court, D. Connecticut.

Oct. 24, 2000.

**582**

Anthony F. Dipentima, Guion, Stevens & Rybak, Litchfield, CT, Gina M. Von Oehsen, Garrett & Von Oehsen, Stamford, CT, Russel H. Beatie, Jr., Curt D. Marshall, Beatie & Osborn, New York City, for Plaintiffs.

Paul D. Sanson, Shipman & Goodwin, Hartford, CT, Steven C. Dubuc, Anthony King, Richard E. Wallace, John W. Kampman, Wallace, King, Marraro & Branson, Washington, DC, for Defendants.

## RULING ON DEFENDANTS' MOTION TO DISMISS [DKT. NO. 74], PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [DKT. NOS. 70 AND 77] AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 69]

HALL, Judge.

This case arises out of the discovery of a chemical known as methyl tertiary-butyl ether ("MTBE"), which is known to cause negative health effects, in the groundwater near a Shell service station located in Wilton, Connecticut. The plaintiffs, Catherine Martin and Dorinda Fruge, on behalf of themselves and all others similarly situated, contend in their Second Amended Class Action Complaint [Dkt. No. 67] ("Complaint") that the MTBE found in their wells is attributable to the Shell Oil Company ("Shell") and its successor in interest, Motiva Enterprises, LLC ("Motiva").

The defendants seek to dismiss the plaintiffs' claim for injunctive relief against them on the basis of the primary jurisdiction doctrine.[1] Specifically, the defendants contend that the Connecticut Department of Environmental Protection ("CTDEP") has jurisdiction over the matter and has in fact addressed the issue of the MTBE in the Wilton groundwater in a series of Orders, the most recent of which was entered in August 1998.[2]

The plaintiffs respond by arguing that the relief sought in this proceeding has not been provided by the CTDEP and is unlikely ever to be provided by that agency. In addition, they seek certification of a class of individuals they allege have been harmed by Shell's actions, consisting of "all persons or entities that own and/or use groundwater and wells in the vicinity of the Service Station and who were damaged by the conduct and/or omissions of defendants." Complaint at ¶ 14. This class, the plaintiffs contend, covers a broader group of individuals than that granted relief by the CTDEP's orders.

The defendants oppose the class certification motion, primarily on the ground that in order to determine who the members of the class are, the court would essentially have to try the case. In other words, in order to determine which Wilton and Georgetown residents have been injured by Shell, the defendants say, the court would have to undertake

---

**1.** The defendants additionally seek dismissal of the plaintiffs' CUTPA claim on the grounds that the plaintiffs cannot sufficiently demonstrate that they were in either a consumer or business relationship with the defendants. The plaintiffs disagree with the defendants' characterization of their relationship to the defendants, but agree to dismissal without prejudice. In order to avoid unnecessarily deciding any issues on a motion to dismiss where the parties are in agreement that the claim should not be litigated at this time, the court dismisses the CUTPA claim without prejudice.

**2.** The defendants contend that, because the Orders are cited extensively in the Complaint and were issued by a public agency, they may properly be studied by the court in conjunction with a motion to dismiss the Complaint. The court agrees. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991).

a complete causation analysis as to each such proposed class member, thus negating the typicality and predominance requirements of Federal Rule of Civil Procedure 23(a) and (b).

In response, the plaintiffs contend that the issue of causation has already been decided by the CTDEP in its August 1998 Order, and that Shell is therefore collaterally estopped from contesting causation as to any proposed class members.[3] On the basis of the CTDEP orders, the plaintiffs further seek partial summary judgment as to causation.

Thus, the issues before the court that are central to the resolution of these three motions are: (1) whether the CTDEP has primary jurisdiction over the issues raised in this litigation, and (2) whether the Orders entered by the CTDEP thus far collaterally estop Shell from denying liability and therefore, together with the other Rule 23 factors, render class treatment appropriate.

## I. FACTS

On March 25, 1992, the Commissioner of the CTDEP unilaterally issued an Order, captioned "State of Connecticut v. Shell Oil Company," finding that Shell owned and maintained an underground storage tank at its property at 912 Danbury Road in Wilton, that groundwater at the site was polluted with components of gasoline and that by virtue of these facts, Shell had "created or [was] maintaining a facility or condition which reasonably [could] be expected to create a source of pollution to the waters of the State and is the owner of land from which a potential source of pollution emanates." Exh. A to Memorandum in Support of Defendants' Motion to Dismiss [Dkt. # 12] at ¶¶ A1–A4. The Commissioner set forth a schedule in the Order requiring, *inter alia,* that Shell retain consultants to investigate the site, submit a scope of study for the investigation, carry out the investigation, submit alternative remediation plans and propose a preferred remediation plan and, upon approval of the plan by the Commissioner, carry out such remedial actions. *See* Exh. A to Memorandum in Support at ¶ B1. The Order specifies that it "shall neither create nor affect any rights of persons who or municipalities which are not parties to this order." *Id.* at ¶ B16. Nothing in the Order indicates that the plaintiffs in the instant action were parties thereto.

In September 1992, Shell and the CTDEP entered into a Consent Order following a hearing that resolved an appeal by Shell from the original March 1992 Order. *See* Exh. B to Memorandum in Support at ¶ 5–7. The Consent Order reflects the finding that groundwater at the property at 912 Danbury Road "is polluted with components of gasoline, including but not limited to methyl tertiary butyl ether (MTBE)." *Id.* at ¶ 3. The Order further required Shell to, *inter alia,* retain a qualified consultant;[4] submit a scope of study for an investigation of the "potential impact" of the groundwater pollution "on the environment both on-site and off-site, including . . . the existing and potential extent and degree of soil, ground water and surface water pollution;" perform additional investigations if necessary;[5] propose remedial measures; notify each intervenor and party of the Commissioner's approval or disapproval of the remediation plan so that such intervenors/parties could request hearings; and perform remedial and monitoring measures in accordance with the Consent Order. *Id.* at ¶ B1. The Consent Order further specifies that none of its provisions and no action or inaction by the Commissioner "shall be construed to constitute an assurance by the Commissioner that the actions taken by [Shell] pursuant to this consent order will result in compliance or prevent or abate pollution;" and that the order "shall neither create nor affect any rights of persons who or municipalities which are not parties to this consent order." *Id.* at ¶¶ 14, 16. Again, nothing in the Consent Order

---

3. The defendants had also filed a motion for leave to file a surreply and to depose expert witness [Dkt. No. 55] in connection with the plaintiffs' collateral estoppel argument. At a status conference held July 18, 2000, defendants withdrew their request to depose the expert witness, and the court authorized the filing of the defendants' surreply. Thus, the surreply has been considered in deciding the class certification motion.

4. The CTDEP had already approved and Shell had hired Groundwater Technology, Inc., but the Commissioner retained the right to disapprove that or any other consultant.

indicates that the plaintiffs were intervenors or parties to that order.

Finally, in August 1998, the CTDEP issued a third Order finding that "[g]roundwater on and emanating off-site is polluted with components of gasoline including but not limited to methyl tertiary-butyl ether (MTBE)," that "[t]he Commissioner of Public Health has determined that the extent of pollution creates or can reasonably be expected to create an unacceptable risk of injury to the health or safety of persons using the polluted ground waters as a public or private source of water for drinking or other personal or domestic uses," and that "the extent of pollution creates or can reasonably be expected to create an unacceptable risk of injury to the health or safety of persons using such waters as a public or private source of water for drinking or other personal or domestic uses, and [Shell] is responsible for such pollution." Exh. C to Memorandum in Support at ¶¶ A4–A8.

The August 1998 Order further orders Shell to provide short-term and long-term potable drinking water supplies to the Shell property at 912 Danbury Road, the Wilton Shopping Center at 920 Danbury Road and "each additional property which the Commissioner of Environmental Protection determines necessary ... to be within the area of polluted ground waters or within an area where pollution of ground waters is imminent." *Id.* at ¶¶ B1(c)–(h). This order identifies several additional properties for which Shell was required either to provide short and long-term potable water supplies or monitor water quality, including the Martin property at 3 Church Street, the Trasky property at 856 Danbury Road (which is also the address of named plaintiff Dorinda Fruge), and five other neighboring properties on Danbury Road, New Street, and West Church Street. *See id.* at ¶ B1(h). Under the monitoring requirement, if two out of three tests of the water within a fifteen day period reveal levels of certain compounds "including but not limited to MTBE ... which. exceeds a level which that Commis-

sioner of Public Health has determined ... creates or can reasonably be expected to create an unacceptable risk to the health or safety of persons using such waters for drinking or other personal or domestic uses," then Shell shall provide short- and long-term potable drinking water pursuant to the order. *Id.* at ¶ B1(i)(2). Thus, the third Order requires the provision of potable drinking water to these or additional addresses only if the levels of MTBE exceed the Commissioner of Public Health's determination of a level that poses a health risk. Once potable water is being provided, if the levels of contamination drop sufficiently below the "current action level" for that compound, Shell may stop providing potable water. Similarly, the monitoring requirements may be reduced or terminated under the order if the concentration level of MTBE or other substances falls below 50% of the "current action level" for the substance during specified time periods. *See id.* at ¶ 1B(i)(3)–(4).

On June 9, 2000, the CTDEP issued a letter agreeing to modify the area impacted by the 1998 Order. The letter was issued in response to evidence presented to the CTDEP by the defendants that proposed limiting the area subject to ongoing investigation and remedial measures under the 1998 Order. The evidence submitted to the CTDEP demonstrated that the flow of groundwater from the Shell Station is limited to a particular path and, thus, any contamination originating from the Shell Station could only affect certain properties. The June 2000 letter from CTDEP indicated that the evidence supported a modified list of locations for future sampling and, thus, modified the 1998 Order to limit the number of sites for which the defendants were responsible for continuing monitoring. *See* Defendants' Supplemental Filing in Opposition to Motions for Class Certification and Summary Judgment [DKT. NO. 64], Exh. 3.

This diversity suit was initiated against Shell in July 1999.[5] Plaintiffs seek certification of a class and relief for negligence, negligence per se, strict liability for ultra-

---

5. The original plaintiff, Catherine Martin, was joined by plaintiff Dorinda Fruge in the Amended Class Action Complaint filed in November 1999. The suit was dismissed *sua sponte* by the court in June 2000 for failure adequately to plead citizen-

ship. *See* Order of Dismissal [Dkt. No. 65]. A Second Amended Class Action Complaint, which is the subject of this Ruling, was filed July 7, 2000 [Dkt. No. 67] and the previously pending motions for class certification, partial summary

hazardous activity, gross negligence, private nuisance, trespass and fraud. *See* Complaint at ¶¶ 65–70, 72–77, 79–84, 86–90, 92–96, 98–103, 105–110. In addition to money damages, the plaintiffs seek, *inter alia,* an order "[e]njoining defendants from allowing the continued migration of hazardous substances onto the properties of the plaintiffs and the members of the Class" and "[r]equiring defendants to connect plaintiffs and the members of the Class to a potable water supply." *See id.* at 41.

## II. PRIMARY JURISDICTION

Defendants contend that this court should refrain from exercising jurisdiction over the plaintiffs' claims because the CTDEP is already in the process of addressing the issue of groundwater contamination near the Shell site. The plaintiffs disagree, arguing that the CTDEP has not and will not likely address the specific claims they raise.

■ The doctrine of primary jurisdiction "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *Johnson v. Nyack Hospital,* 964 F.2d 116, 122 (2d Cir.1992) (quoting *United States v. Western Pac. R.R.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). "Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter v. Cooper,* 507 U.S. 258, 268–69, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). Although the doctrine arose out of situations involving jurisdictional conflicts between federal courts and federal agencies, *see, e.g., Goya Foods, Inc. v. Tropicana Products, Inc.,* 846 F.2d 848 (2d Cir.1988), it has been held applicable where state agen-

cies have jurisdiction over issues sought to be raised before federal district courts. *See Johnson, supra,* 964 F.2d at 122–23. "The aim of the doctrine ... is to ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross-purposes." *Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.,* 84 F.3d 91, 97 (2d Cir.1996) (citations omitted).

■ In determining whether to apply the doctrine, courts generally look to four factors. These are: (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question at issue is particularly within the agency's discretion; (3) whether there exists a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made. *See National Communications Assoc. v. American Telephone and Telegraph Co.,* 46 F.3d 220, 222–23 (2d Cir.1995). In addition, courts must "balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." *Id.* at 223.

■ With respect to the first and second factors, the court is not persuaded that the questions at issue require the specialized technical expertise of the CTDEP. Although the resolution of the issues in this case undoubtedly will require some technical analysis, the claims—for example, whether Shell breached a duty to the plaintiffs, whether Shell trespassed or created a nuisance on the plaintiffs' property, whether Shell defrauded the plaintiffs, or whether Shell was willful, wanton or reckless in its actions toward the plaintiffs—are all of a type commonly adjudicated by the courts. They do not require extensive interpretation of agency regulations.[6] Although the CTDEP undoubtedly

---

judgment and dismissal were renewed. [Dkt. Nos. 69, 70, 74 and 77]. The defendants' motion seeking to incorporate their prior filings in opposition to the motion for class certification [Dkt. No. 72] was previously granted by the court.

**6.** The one possible exception to this general observation is the plaintiffs' claim of negligence per se, since resolution of that claim will require a determination as to whether the defendants violated various state and federal environmental

statutes and regulations. Under the doctrine of negligence per se, the elements of duty and breach in a negligence action are satisfied by proof that the defendant has violated a relevant statute or regulation and that the party injured is a party whom the statute or regulation was intended to protect. However, even the resolution of that claim requires simply the application of the regulations to the facts at hand, not the interpretation of the regulations or abstract policy questions in a manner that requires the agen-

possesses expertise in the area of environmental pollution, the defendant has not persuaded this court that the CTDEP's expertise is essential in adjudicating the matters at hand. *See, e.g., Luckey v. Baxter Healthcare Corp.*, 1996 WL 242977 at *5 (N.D.Ill. May 9, 1996).

Turning to the third factor, whether there exists a substantial danger of inconsistent rulings, the court finds that there is very little risk of such a problem in this case. Although standards of public health and public safety may provide relevant evidence or material for argumentation in the case, they are not dispositive of the claims in the case, all of which, except negligence per se, sound in private tort actions at common law, independent of any statutory standard.[7] For example, whether or not the pollutants in the groundwater on the Fruge/Trasky property exceed 70 parts per billion is not dispositive of that plaintiff's claims of trespass, private nuisance or negligence. The court is unaware, for example, of any minimum amount of a foreign substance that must be found on a plaintiff's property in order for that plaintiff to state a claim for trespass. *See Hanson v. Carroll*, 133 Conn. 505, 508, 52 A.2d 700 (1947) ("At common law every unwarrantable entry by one upon the land of another was a trespass.") A trespass is a trespass, and no ruling as to whether the defendants trespassed on the plaintiffs' property will necessarily conflict with any finding of the state agency.

Finally, with respect to the fourth factor, the state agency, while finding generally that Shell is liable for groundwater pollution at "the site," meaning its own property at 912 Danbury Road, has declined to rule on whether Shell is in fact responsible for the spread of that contamination to any other specific properties besides the Wilton Shopping Center. There is no assertion by either party that the plaintiffs in this proceeding were ever parties to any action before the agency. Notwithstanding plaintiffs' assertions to the contrary in their motion for summary judgment, an order requiring Shell to continue monitoring the named plaintiffs' properties and a finding of some pollutants on those properties does not amount to a finding by the CTDEP that such pollutants on those particular properties were caused solely by Shell. It is merely a finding that Shell is responsible for pollution of the groundwater on its own property and "emanating" around it, that such pollution may have spread to neighboring properties (with-

cy's particularized expertise. *See Fulton Cogeneration Assocs., supra,* 84 F.3d at 97–98 (holding that even where agency could exercise proper jurisdiction, application of primary jurisdiction doctrine inappropriate where issues were "neither beyond the conventional expertise of judges nor within the special competence of the [agency]"); *National Communications Assoc., supra,* 46 F.3d at 223 (holding that "[p]rimary jurisdiction does not extend to a legal question that is within the conventional competence of the courts, and the judgment of a technically expert body is not likely to be helpful in the application of these standards to the facts of the particular case" where case required enforcement of a tariff filed with FCC because the case did "not involve the statutory reasonableness of the tariff or other abstract concepts," but rather whether defendant had paid its bills) (citations omitted). *See also Luckey v. Baxter Healthcare Corp.,* 1996 WL 242977 at *5 (N.D.Ill. May 9, 1996) (holding primary jurisdiction doctrine not applicable to tort claims arising out of use of pesticide products registered with the EPA, despite EPA regulation in the area, because "plaintiff's complaint was directed solely toward the allegedly tortious actions of the defendant and did not depend upon a showing of irregularity in the EPA's regulation of the products" and because despite

EPA's competence in field, "[t]housands of tort cases involving technical issues of product design and safety are decided by courts every year").

That the CTDEP's findings regarding Shell's actions on the Wilton site in general may eventually be considered as evidence of Shell's duty and breach under the negligence per se doctrine in some later stage of this case and may even be dispositive on such issues does not militate against allowing this action to proceed.

7. Again, with respect to negligence per se, the court notes that it is possible that the CTDEP could reach one conclusion as to whether a law or regulation had been violated and this court could reach another. However, if the CTDEP were to determine the issue in an appropriate adjudicative proceeding before the resolution of this case, the court could be bound by that determination, and vice versa. *See, e.g., Carothers v. Capozziello,* 215 Conn. 82, 94, 574 A.2d 1268 (1990) (noting that "[a]s a general proposition, the governing principle is that administrative adjudications have preclusive effect when the parties have had an adequate opportunity to litigate") (citations omitted). Thus, the danger of inconsistent rulings is minimal even with respect to the negligence per se count.

out identifying which neighboring properties), and that Shell will therefore be required to take monitoring and remedial steps as to some much broader set of properties within the area to help determine whether it is possible that the groundwater pollution from the Shell site has spread to other sites. Thus, the CTDEP has not yet definitively ruled on the issues presented by this case, namely, whether Shell is in fact responsible for the particular contamination occurring on the plaintiffs' properties or all properties in the "vicinity."

Moreover, the CTDEP is charged with protecting the environment for the public's health and safety. *See, e.g.,* Conn.Gen.Stat. § 22a–1 (enacting environmental protection laws "to enhance the health, safety and welfare of the people of the state") and § 22a–2 (granting CTDEP "jurisdiction over all matters relating to the preservation and protection of the air, water and other natural resources of the state"). It does not have the purpose of vindicating individual property rights such as those asserted by the plaintiffs in this case. It is the court's understanding that, pursuant to the CTDEP's own August 1998 Order regarding the Shell station, the CTDEP is unlikely to initiate any sort of enforcement action against the defendants for any amount of pollution that is lower than the amounts deemed "actionable" by the state or amounts that, in the opinion of the state, pose a threat to public health and safety.[8] Thus, the court finds that under the fourth primary jurisdiction factor, an applica-

tion to the CTDEP would not necessarily result in a vindication of the plaintiffs' rights and the agency has not previously considered such an application by the plaintiffs on the specific issues raised by the Complaint.

Finally, the court finds that the advantages of applying the doctrine are outweighed by the potential costs resulting from complications and delay in the administrative proceedings. The CTDEP has had the Shell station in question under investigation for at least eight years, since its original 1992 Order. It is not clear that any action by the CTDEP will address the plaintiffs' concerns in the near future. Nor is it clear that, by considering the plaintiffs' claims, this court will in any way be interfering with the CTDEP's ongoing regulation of the Shell site.[9]

For the foregoing reasons, the court declines to dismiss this action under the primary jurisdiction doctrine. The defendants' motion to dismiss is therefore denied.

## III. COLLATERAL ESTOPPEL

The issue of whether the CTDEP's orders collaterally estop Shell from contesting causation in this proceeding is central both to the class certification motion and the plaintiffs' summary judgment motion. The doctrine of collateral estoppel "bars a party from relitigating in a second proceeding an issue of fact or law that was litigated and actually decided in a prior proceeding, if that party had a full and fair opportunity to liti-

---

**8.** *See* Exh. C to Memorandum in Support at ¶¶ B1(i)(2) –(4) and B1(j) (stating that Shell's continued monitoring and potable water provision responsibilities are tied to whether the level of contamination "exceeds a level which the Commissioner of Public Health has determined ... creates ... an unacceptable risk to ... health or safety" and the "then current action level" for such compounds).

**9.** Defendants rely heavily on a District of New Mexico case, *Schwartzman, Inc. v. Atchison, Topeka & Santa Fe Ry.,* 857 F.Supp. 838 (D.N.M. 1994), in support of their invocation of the primary jurisdiction doctrine. That case is inapposite because, in that case, the plaintiffs were claiming a public nuisance. Such a claim is more in line with the responsibilities of a state agency of environmental protection, which is to protect the environment for the public's health and safety. The court in that case was especially

cognizant of the fact that, if it ruled for the plaintiffs on the public nuisance cause of action, it would have to fashion an investigation and remediation order that would essentially cover the same subject matter as a similar order issued by the state agency. That court noted, "If [p]laintiff's ultimate goal is remediation of the site, this goal would be achieved faster and more efficiently through the joint efforts of the EPA and the [New Mexico Environmental Department] without interference from the Court." *Id.* at 842. However, the goals of the plaintiffs in the instant case appear to be different enough from the goals of the CTDEP to warrant retaining jurisdiction in this court. Rather than being concerned with "remediation of the [Shell] site" in an effort to abate a public nuisance, the plaintiffs are concerned with remediation of *their own* real property, and not merely to a degree that the CTDEP determines is acceptable to the public.

gate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 365 (2d Cir.1992). Title 28 U.S.C. § 1738 governs the preclusive effect to be given judgments and records of state courts. *University of Tennessee v. Elliott,* 478 U.S. 788, 794, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986). Under that section, a federal court must give the same preclusive effect that a state court would give to a state judicial proceeding. *Zanghi v. Incorporated Village of Old Brookville,* 752 F.2d 42, 46 (2d Cir. 1985). However, the statute is not applicable to unreviewed state administrative factfinding. *University of Tennessee,* 478 U.S. at 794, 106 S.Ct. 3220. Thus, when a state administrative proceeding is at issue, the court must determine whether a federal common-law rule of preclusion is appropriate. *See id.* at 794–95, 106 S.Ct. 3220. In *University of Tennessee,* the Supreme Court held that "when a state agency 'acting in a judicial capacity . . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate,' federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Id.* at 799, 106 S.Ct. 3220 (quoting *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)); *see also Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Bray v. New York Life Insurance,* 851 F.2d 60, 62 (2d Cir.1988).

In order for preclusion to apply to an agency decision, the administrative proceeding has to have been adjudicative in nature. *See Delamater v. Schweiker,* 721 F.2d 50, 53 (2d Cir.1983). "If the administrative proceeding has not been of an adjudicative nature, a decision arrived at by the administrative agency cannot have res judicata effect." *Id.* In order to be adjudicative, the administrative agency must make its decision using procedures "substantially similar to those employed by the courts." *Id.* (citing Restatement (Second) of Judgments § 83 comment b (1982)). In *Delamater,* the Second Circuit held that an administrative decision by the Social Security Administration did not

have preclusive effect where its decision to grant benefits was made with "no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation." *Id.* at 54. Conversely, in *Zanghi,* the Second Circuit found that preclusive effect was properly given to an administrative finding of probable cause where the determination was a necessary prerequisite to the administrative court's decision and the administrative hearing followed procedures substantially similar to those used in courts, including representation of counsel. *Zanghi,* 752 F.2d at 46.

In Connecticut, preclusive effect is also given to a consent order issued by an administrative agency when a party enters into the order voluntarily and, in doing so, foregoes an opportunity to contest it. *See Carothers v. Capozziello,* 215 Conn. 82, 95–96, 574 A.2d 1268 (1990). Thus, in *Carothers,* preclusive effect was given to a final consent order that specifically stated that the defendants were operating a "solid waste land disposal and/or transfer facility." *Id.* at 95, 574 A.2d 1268. The Connecticut Supreme Court found that the defendants could not later challenge the conclusion that their activities constituted operation of a "solid waste facility." *Id.* at 96, 574 A.2d 1268. Preclusive effect will usually not be given, however, to an administrative adjudication that permits no opportunity for judicial review of any kind. *See Convalescent Center of Bloomfield, Inc. v. Dept. of Income Maintenance,* 208 Conn. 187, 199–202, 544 A.2d 604 (1988).

■ In this case, the plaintiffs contend that the 1998 CTDEP Order imposes a binding finding that Shell caused contamination in the wells of the named plaintiffs and the putative members of the class. According to the plaintiffs, the 1998 CTDEP Order rested in part on the 1992 Consent Order, which was agreed to by the defendants. Under the 1992 Consent Order, either party could request an administrative hearing on a decision by the Commissioner approving or disapproving any remedial action proposed. The Consent Order was deemed a "final order of the Commissioner with respect to the matters addressed herein." Plaintiff's Reply Memorandum for Partial Summary Judg-

ment [Dkt. No. 62], Exh. A, para. B. 9. Under *Carothers,* the 1992 Consent Order would have preclusive effect as to the issues contained in that order because it was a final order with some means of review that was entered into freely by both parties. *See* 215 Conn. at 95–96, 574 A.2d 1268. However, the fact that the Consent Order would have preclusive effect does not establish that the 1998 Order also has preclusive effect.

The 1998 Order was not a consent order, but was instead issued unilaterally by the CTDEP. The plaintiffs argue that this Order was issued through an adjudicative process because the defendants had an opportunity to contest the order. The defendants argue that an opportunity to challenge is not sufficient for collateral estoppel when an actual adjudicative process did not occur. Had the CTDEP issued the 1998 Order without any process or means for review, the Order would not have preclusive effect. However, the CTDEP gathered evidence by considering the 1992 Consent Order as well as evidence supplied by Shell, made its determination based on that evidence, and provided Shell with an opportunity to contest their findings by requesting a hearing. The CTDEP thus followed a procedure substantially similar to a court procedure and the defendants had an opportunity to litigate the issues contained in the order. Therefore, the 1998 Order has preclusive effect with regard to the issues decided in that order.

The collateral estoppel analysis does not end here, however. The court must next determine whether the 1998 Order has preclusive effect with respect to the particular issue in this case. The plaintiffs argue that the defendants should be collaterally estopped from raising the issue of causation. The court must thus determine whether the defendants had a full and fair opportunity to litigate the issue of causation and whether the issue of causation was necessary to the 1998 Order. As noted above, neither of the orders issued by the CTDEP are clear as to the extent of Shell's actual liability to the plaintiffs or proposed plaintiff class. At best, the orders find that some MTBE did leak from the Shell station's underground storage tank into the groundwater at the Shell station and at some unspecified "off-site" locations, and that Shell is responsible for such leakage. The orders do not identify the "off-site locations," and although the CTDEP has ordered monitoring of various sites in the vicinity, the court cannot read the orders as conclusively ruling that the sites Shell must monitor, or any others, are the "off-site locations" that Shell is responsible for contaminating. Furthermore, the recent letter from the CTDEP recognizing the groundwater flow evidence provided by Shell and modifying the area for which Shell is responsible suggests that the order did not find causation specific to each site. Because causation was not necessary to the 1998 Order, the defendants have not had a full and fair opportunity to litigate this issue and thus, the 1998 Order does not collaterally estop them from raising the issue of causation in this proceeding.

Having found that the CTDEP Orders do not collaterally estop Shell from now contesting the issue of causation, the court must deny plaintiffs' motion for partial summary judgment.

## IV. CLASS CERTIFICATION

The court now turns to the question of whether the plaintiffs have adequately shown that they can meet the requirements of Rule 23. Rule 12(a) sets forth the prerequisites to class certification as follows:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition, Rule 23(b)(3) requires that

> the court find[ ] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). In evaluating whether the plaintiffs have shown predominance and

superiority, the court should consider (A) the interest of the class members in individually controlling the prosecution or defense of separate actions; (B) the extent of any litigation concerning the controversy already commenced by or against class members; (C) the desirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *See* Fed. R.Civ.P. 23(b)(3).

A class certification motion " 'may involve some considerations related to the factual and legal issues that comprise the plaintiff's cause of action.' " *Pecere v. Empire Blue Cross and Blue Shield,* 194 F.R.D. 66, 69 (E.D.N.Y.2000) (quoting *D'Alauro v. GC Servs. Ltd. Partnership,* 168 F.R.D. 451, 454 (E.D.N.Y.1996)). The court should accept the allegations in the complaint as true and not conduct a preliminary inquiry into the merits of the case. *Id.* Still, plaintiffs bear the burden of establishing each requirement for class certification. *Id.* In doing so, they cannot rely solely on the allegations of the complaint, but must provide sufficient information on which the court can make a determination. *Id.* (" '[c]ertification ... is dependent on [plaintiff's] proof that each of the requirements of Rule 23(a) ... has been met.' ") (quoting *Lloyd v. Industrial Bio-Test Labs., Inc.,* 454 F.Supp. 807, 811–12 (S.D.N.Y.1978)).

In this case, the defendants contend that the requirements of commonality, typicality and predominance cannot be met because the potential plaintiffs' claims will require individualized proof as to causation (i.e., the spread of the groundwater and the contaminants in the groundwater to each of the potential class members' properties) as well as damages. The plaintiffs respond that individualized proof of damages is no bar to the certification of a 23(b)(3) class, and that the issue of causation is *res judicata* in light of the CTDEP's various Orders on the issue of MTBE emanating from the Shell station site.

### A. *Numerosity*

The standard for numerosity under Rule 23(a) is not tied to a minimum number, but rather is whether the class is so numerous that joinder of all members is impracticable. *See, e.g., Jones v. CCH–LIS*

*Legal Information Servs.,* 1998 WL 671446 at *1 (S.D.N.Y. Sept.28, 1998) ("There is no magic minimum number that breathes life into a class."). Generally, courts will find a class sufficiently numerous when it comprises 40 or more members. *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir.1993); *Ansari v. New York Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998) (citing Moore's Fed.Prac. § 23.22[2] ). However, an estimate that is based on speculation is insufficient. *See Deflumer v. Overton,* 176 F.R.D. 55, 58–59 (N.D.N.Y.1997) (holding that "pure speculation ... is insufficient to satisfy [movant's] burden"); *see also Demarco v. Edens,* 390 F.2d 836, 845 (2d Cir.1968) (disapproving maintenance of class action where assertions of numerosity and impracticability are "pure speculation"). In addition, the presumption that a class of 40 or more is sufficiently numerous does not provide "rigid parameters," and "the ultimate issue is whether the class is too large to make joinder practicable." *Id.* Because the plaintiffs bear the burden of demonstrating joinder is impracticable, they must show "some evidence of or reasonably estimate the number of class members." *Pecere, supra,* 194 F.R.D. at 70 (internal quotations and citations omitted).

Thus, where a class is not obviously numerous, courts should, in addition to the number of proposed class members, consider such factors as the aid to judicial economy from the avoidance of multiple actions, the geographic dispersion of the proposed class members, the financial resources and ability of the class members to institute individual suits and the possibility that, without class certification, injunctive relief could lead to inconsistent results. *See Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir.1993); *Duprey v. Connecticut Dep't of Motor Vehicles,* 191 F.R.D. 329, 333 (D.Conn.2000); *Pecere, supra,* 194 F.R.D. at 70–71; *Ansari, supra,* 179 F.R.D. at 114.

In this case, the plaintiffs estimate that the proposed class includes between 118 and 178 persons. They arrive at this figure by estimating that there are two to three household members for each of the 59 wells currently being monitored by the defendants that have been found to be contaminated by

MTBE. *See* Plaintiffs' Reply Memorandum [Dkt. No. 53] at 10. The defendants argue that this number is based on the inaccurate assumption that Shell is responsible for the contamination of all of the properties and that, in fact, the number of properties affected by contamination from Shell is limited. *See* Memorandum in Support of Defendants' Opposition [Dkt. No. 47] at 25.

The plaintiffs have submitted no evidence to support their claim that the class is sufficiently numerous, nor have they provided a reasonable estimate of the number of class members.[10] The plaintiffs rely solely on an estimate based on the number of wells Shell is currently monitoring pursuant to the CTDEP's 1998 Order. As discussed above, this estimate is not supported by any evidence that Shell is actually responsible for contaminating these particular wells. The defendants provide evidence that, because of the flow of groundwater, they can be responsible for contamination in only a limited number of the wells. The plaintiffs do not provide any evidence to the contrary. In addition, the plaintiffs' estimate of class numbers relies on a speculative estimate of the number of users per well, rather than a specific determination. Finally, the estimate is not supported by evidence that any possible users of the water from the wells who may have experienced similar injuries would be unable to join the instant proceeding or file their own lawsuits if they so desired. *See Pecere, supra,* 194 F.R.D. at 70 (denying class certification where plaintiffs "failed to proffer any evidence to permit a reasonable estimate of the number of persons who fit within the proposed class"); *Deflumer,* 176 F.R.D. at 58–59; *see also Demarco,* 390 F.2d at 845.

Turning to the additional factors outlined by the *Robidoux* court, the court similarly finds that the plaintiffs have not met their burden. Other than the two named plaintiffs, the court is unaware of whether any of the other proposed class members have any interest in litigating these issues or having them litigated on their behalf, nor is the court aware of any additional suits that have been brought or are likely to be brought, even though it has been eight years since the CTDEP first issued its 1992 order stating it had found contamination in the Shell site groundwater. Thus, it is not clear that class treatment would avoid multiple actions. *See Ansari, supra,* 179 F.R.D. at 114 (denying class certification where court found it was "not a situation where individual members of the prospective class have filed or threatened to file their own actions" and considering the fact that no suits had been filed in two years since alleged injury occurred); *Deflumer, supra,* 176 F.R.D. at 58–59 (denying class certification for failure to satisfy numerosity requirement where "no showing [had] been made that anyone other than the two named plaintiffs [fell] within the proposed class"). Second, the proposed plaintiffs are not geographically dispersed. In fact, the crux of the plaintiffs' argument is that the plaintiffs were injured because of their close geographical proximity to the alleged source of pollution. Third, the court has no information as to the financial resources and ability of the class members to institute individual suits. Finally, the plaintiffs have not demonstrated how the injunctive relief they seek would lead to inconsistent results if the claims were adjudicated individually. Presumably, each proposed plaintiff could litigate whether the defendants' property was a source of contamination, if any, on that plaintiff's property, what steps Shell would need to take with respect to site remediation on each plaintiff's own property and what damages that plaintiff suffered. The court sees no reason why this would necessarily affect any injunctive relief granted to different plaintiffs in the vicinity.

Therefore, the plaintiffs have failed to meet their burden of showing that the class is so numerous as to be impracticable to

---

**10.** Although the plaintiffs are correct that the court should not analyze the merits of their case in deciding the class certification motion, the court notes that the assumptions on which their calculations rest may not be "sufficient evidence" to allow the inference the plaintiffs seek to draw as to the number of proposed class members. *See, e.g., Deflumer v. Overton,* 176 F.R.D. 55, 58–59 (N.D.N.Y.1997) (denying class certification for failure to demonstrate numerosity where defendants allegedly used computer generated letters in engaging in illegal debt collection practices and plaintiffs sought to estimate size of class by proving defendants represented several large area hospitals).

manage through joinder. They have also failed to demonstrate that other factors favor a finding of impracticability. The class therefore may not be certified.

### B. *Commonality and Predominance*

■ Even if the numerosity requirement had been met, there is an additional defect in the plaintiffs' proposed class. Defendants do not contest that there are sufficient common issues of law and fact to satisfy the Rule 23(a) commonality requirement, but argue that the plaintiffs cannot satisfy the requirement of Rule 23(b) that such common issues "predominate" because the claims require individualized proof of causation. The court agrees.

As discussed above, the court has rejected the plaintiffs' argument that the issue of causation has already been adjudicated. *See supra* at 586–87, 588. Thus, the proof of causation, while it may involve similar evidence for each of the plaintiffs, will not likely be identical.

■ The plaintiffs identify a number of other issues they contend are "common issues of law and fact." These include whether the health of the proposed class members has been harmed by the contamination; whether their property values have been negatively affected; whether the defendants' conduct constituted negligence, gross negligence, negligence per se, trespass or private nuisance; whether the defendants should be required to provide potable water, health monitoring and water monitoring to the proposed class members. Common to these issues is the basic question of whether the leakage of MTBE emanating from the Shell property extended to the property of a plaintiff and, if so, to what degree. Without delving into the merits of the defendants' argument at this time, the court notes that it is likely these issues will require individualized proof. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (noting that in determining the propriety of a class action, "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met") (citations omitted); *cf. General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (noting that district court must conduct "rigorous analysis" to determine whether the Rule 23 requirements have been satisfied). The defendants have indicated they will argue at trial [11] that there are several other potential sources of MTBE in the area and that groundwater does not move in a predictable fashion, and the plaintiffs themselves have submitted evidence in support of their motion showing that the levels of MTBE in the water of the two named plaintiffs are dramatically different, suggesting that resolving the questions of how the MTBE traveled to each of the plaintiffs' properties and whether there is another source will likely differ as to different sites.

In contrast, the issues of whether and when the defendants became aware of the leaks; whether the defendants adequately disclosed information about the contamination to the proposed class members; whether the defendants profited from operating the Shell station; whether the proposed class members are at risk for future health problems; and whether the contaminants can cause adverse health effects all may well be supported by common evidence. *See* Plaintiffs' Memorandum in Support at 9–10. However, the court does not find that these common issues of law and fact are sufficient to overcome the extensive individualized proof of, *inter alia,* breach, causation and trespass [12] that is likely to be required.

---

**11.** It is not appropriate for the court on a motion for class certification to resolve conflicts concerning the merits of the underlying cause of action. *See Caridad v. Metro–North Commuter Railroad,* 191 F.3d 283, 292–93 (2d Cir.1999) (holding that "statistical dueling" between parties' experts on fact issues was "not relevant to the certification determination"). Therefore, the court does not comment on the sufficiency of the evidence on either side with respect to the plaintiffs' causes of action, but merely notes that, given the parties' current positions, the nature of the plaintiffs' claims will likely require individualized proof as to issues of causation.

**12.** The defendants additionally argue that proof of damages will need to be individualized, and that this favors denial of the certification motion. The court does not agree. Individualized questions regarding the extent of damages will not defeat certification. *See In re Lloyd's Amer. Trust Fund Litig.,* 1998 WL 50211 at *14 (S.D.N.Y. Feb.6, 1998); *Duprey, supra,* 191 F.R.D. at 337.

Because the court finds that the plaintiffs have not adequately shown numerosity and predominance, the court need not consider the parties' arguments with respect to typicality or superiority. The plaintiffs' motion for class certification is denied.

## CONCLUSION

For the foregoing reasons, the defendants' motion to incorporate prior filings [Dkt. No. 72] is GRANTED. The defendants' motion to dismiss [Dkt. No. 74] is DENIED with respect to the plaintiffs' claims for injunctive relief. The plaintiffs' CUTPA claim is dismissed without prejudice. The plaintiffs' motions for partial summary judgment [Dkt. No. 69] and for class certification [Dkt. Nos. 70 and 77] are both DENIED.

**SO ORDERED.**

